BOARD OF EDUCATION OF THE CITY OF PEORIA, SCHOOL DISTRICT No. 150, Plaintiff-Appellee, v. TED SANDERS, Superintendent of Education, et al., Defendants-Appellants.

Third District   No. 3—86—0158

Opinion filed December 8, 1986.—Rehearing denied January 27, 1987.

Neil F. Hartigan, Attorney General, of Springfield (Eugene M. Daly, Assistant Attorney General, of Chicago, of counsel), for appellants.

David J. Walvoord and David J. Dubicki, both of Kavanagh, Scully, Sudow, White & Frederick, P.C., of Peoria (Julian E. Cannell, of counsel), for appellee.

JUSTICE HEIPLE delivered the opinion of the court:

The Peoria school district, plaintiff, operates a gifted program pursuant to article 14A of the School Code (Ill. Rev. Stat. 1985, ch. 122, par. 14A—1 *et seq.*). In 1981, the Illinois State Board of Education (ISBE) and its Superintendent, defendants, received complaints alleging that the plaintiff was engaging in intentional racial segregation in the operation of its gifted program. As a result of these complaints, the defendants investigated the plaintiff's gifted program and determined that the under-representation of minorities therein revealed a discriminatory policy on the part of the plaintiff. When the plaintiff made a request for reimbursement of funds to operate the program under section 14A—5 of the School Code (Ill. Rev. Stat. 1985, ch. 122, par. 14A—5), the Superintendent informed the plaintiff that the funds were being withheld because the gifted program was being operated in a discriminatory manner.

The plaintiff filed suit seeking declaratory and injunctive relief as follows:

"A. Declaring that any quota system that grants preferential treatment for admission to a public school's 'gifted program' solely on the basis of race violates the equal protection clause of the Fourteenth Amendment to the United States Constitution.

B. Declaring that [the Superintendent] and the State Board have no authority to withhold reimbursements to local school districts for the 'Gifted Program' because of racial imbalance either under the 'Rules and Regulations to Govern the Administration and Operation of Gifted Education Reimbursement Programs' or the Illinois School Code.

C. Restraining and enjoining [the Superintendent] and the State Board from delaying or denying any application for gifted program reimbursements where such delay or denial is solely on the basis of failure to meet racial quotas in the gifted program enrollment.

D. Granting such other and further relief as the Court may deem just."

The plaintiff subsequently moved for summary judgment. The trial court granted summary judgment and declared that the defendants "have no authority to withhold reimbursements to local school districts for the 'gifted program' because of racial imbalance either under the 'Rules and Regulations to Govern the Administration and Operation of Gifted Education Reimbursement Programs' or the Illinois School Code." The court also enjoined the defendants "from delaying or denying any application for 'gifted program' reimbursements where such delay or denial is on the basis of alleged intentional racial discrimination in the selection of students for participation in the school districts 'gifted student program.'" Finally, the trial court ordered the distribution of withheld funds for the school years 1984-85 and 1985-86 because of alleged intentional racial discrimination by the plaintiff.

The defendants argue on appeal that: (1) the action against them in the circuit court violated the doctrine of sovereign immunity; (2) the circuit court erred in failing to strike plaintiff's complaint and in granting summary judgment on a theory not pleaded in the complaint; (3) State law provides them with authority to withhold State funds from the gifted education program when they determine that a school district is not operating its gifted program for the benefit of all gifted and talented children; (4) the Equal Educational Opportunities Act of 1974 (20 U.S.C.A. secs. 1701 through 1758 (1978)) prohibits them from providing State funds to support an educational program which they determine has been intentionally segregated by race; and (5) the fourteenth amendment and general Federal civil rights statutes also prohibit them from providing State funds to support an educational program which they determine to be intentionally segregated by race. We will address each of these issues seriatim.

■■ ■ Initially, we address the argument that the action against the ISBE and the Superintendent in the circuit court is barred by the doctrine of sovereign immunity. The Illinois Constitution abolished sovereign immunity by providing: "Except as the General Assembly may provide by law, sovereign immunity in this State is abolished." (Ill. Const. 1970, art. XIII, sec. 4.) The General Assembly then enacted the Court of Claims Act (Ill. Rev. Stat. 1985, ch. 37, par. 439.1 et seq.) which provides that the State may not be made a defendant or a party in any court except as set forth in the Act. (Senn Park Nursing Center v. Miller (1984), 104 Ill. 2d 169, 187.) The purpose of the doctrine is that it "protects the State from interference in its performance of the functions of government and preserves its control over State coffers." (S. J. Groves & Sons Co. v. State (1982), 93 Ill.

2d 397, 401.) The supreme court has consistently held that the doctrine does not apply to actions brought in the circuit court which seek to enjoin State officials from acting in excess of their delegated authority. (*Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540.) Further, an action in the circuit court will not be barred by the doctrine of sovereign immunity simply because it requests disbursement of State appropriated funds that have been withheld. (See *Senn Park Nursing Center v. Miller* (1984), 104 Ill. 2d 169; *City of Springfield v. Allphin* (1978), 74 Ill. 2d 117.) For instance, in *Senn Park* three nursing homes sought a writ of *mandamus* against the Director of the Illinois Department of Public Aid directing him to reimburse them for medicaid services in accordance with the Illinois State Medicaid Plan. The supreme court held that the doctrine of sovereign immunity was inapplicable, stating:

> "We believe that in this case, where the defendant officer acted in excess of his statutory authority, the rights of the plaintiffs to be free from the consequences of his action outweigh the interest of the State which is served by the sovereign immunity doctrine. *** In this case, the State cannot justifiably claim interference with its functions when the act complained of by plaintiffs is unauthorized by statute." *Senn Park Nursing Center v. Miller* (1984), 104 Ill. 2d 169, 188.

In *City of Springfield v. Allphin* (1978), 74 Ill. 2d 117, the Director of Revenue made an erroneous determination as to the effective date of an amendment to the Illinois Municipal Code, and withheld from the city of Springfield an amount of money greater than that permitted. Springfield filed an action against the Director for a judgment declaring his interpretation of the amendment to be incorrect and asking that reimbursement be made of the amount wrongfully withheld. The court held that the action was properly brought in the circuit court and stated:

> "Where the issue is whether a State officer has refused to disburse appropriated funds according to law, and the relief sought is an injunction directing that those funds be released in accordance with the appropriation, the action is not one against the State." 74 Ill. 2d 117, 124.

■ The defendants argue that this action is barred by the doctrine of sovereign immunity for two reasons. First, because the plaintiff is seeking to control the actions of a State agency and State officer, the ISBE and the Superintendent. Secondly, because the plaintiff seeks to subject the State to liability, by requiring the ISBE to distribute the funds that were withheld from the plaintiff. We disagree and

believe that the Illinois Supreme Court cases of *Senn Park* and *City of Springfield* dispel both of the defendants' arguments.

In the instant case, the plaintiff sought injunctive and declaratory relief that the defendants, by withholding appropriated funds, were acting in excess of their statutory authority. Such an action is not one against the State. (*Bio-Medical Laboratories, Inc. v. Trainor* (1977), 68 Ill. 2d 540.) The plaintiff also sought to direct the defendants to disburse appropriated funds which were withheld. *Senn Park* and *City of Springfield* establish that the plaintiff's request was not barred by the doctrine of sovereign immunity, and thus was properly brought in the circuit court.

■ The ISBE and the Superintendent next assert that the circuit court erred in granting summary judgment on a legal theory not pleaded in the plaintiff's complaint. The defendants state that the only claim in plaintiff's complaint was "that the defendant, by withholding state funds, seeks to impose an illegal quota system on the plaintiff," and that nowhere in its complaint did the plaintiff allege that the ISBE or the Superintendent lacked authority to withhold funds from a program which they determined was racially segregated. Therefore, defendants argue, it was error for the trial court to grant summary judgment on the ground that "the State Superintendent and State Board have no authority to withhold reimbursements to local school districts for the 'gifted program' because of racial imbalance."

We disagree. A reading of paragraphs 10 and 11 of the complaint, and part B of the prayer for relief, sufficiently set forth the plaintiff's theory and the cause of action upon which the trial judge issued summary judgment. Paragraph 10B states in relevant part:

"Neither [the Superintendent] nor the State Board has legal authority to withhold funds under state or federal law solely on the basis that the admission criteria [to the gifted program] have a 'disparate impact.' "

Paragraph 11 states in part:

"[T]he question presented is whether [the Superintendent] and the State Board may lawfully deny the Peoria School District's request for gifted education reimbursements because of racial imbalance."

Finally, part B of the prayer for relief asks for a declaration that the Superintendent and the ISBE "have no authority to withhold reimbursements to local school districts for the 'Gifted Program' because of racial imbalance." These readings from the complaint amply support the trial judge's ruling and, therefore, the trial judge committed no error.

■ Additionally, the defendants maintain that if a reading of plaintiff's complaint supports the judge's ruling, the complaint was defective and should have been stricken because it violated section 2—603(b) of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—603(b)), which provides:

"Sec. 2—603. Form of Pleadings.
* * *
(b) Each separate cause of action upon which a separate recovery might be had shall be stated in a separate count or counterclaim, as the case may be and each count, * * * shall be separately pleaded, designated and numbered, and each shall be divided into paragraphs numbered consecutively * * *." Ill. Rev. Stat. 1985, ch. 110, par. 2—603(b).

We disagree that the form of the plaintiff's complaint was defective. Section 2—603(b) of the Code of Civil Procedure does not control this matter as the defendants allege. Pleadings in equitable actions are governed by Supreme Court Rule 135(a) (87 Ill. 2d R. 135(a)) (*Nance v. Donk Brothers Coal & Coke Co.* (1958), 13 Ill. 2d 399), which provides in pertinent part:

"Matters within the jurisdiction of a court of equity, * * * may be regarded as a single equitable cause of action and when so treated as a single cause of action shall be pleaded without being set forth in separate counts and without the use of the term 'count.' " (87 Ill. 2d R. 135(a).)

The plaintiff's complaint was within the jurisdiction of a court of equity, as it sought declaratory and injunctive relief. Thus, it was properly regarded and pleaded as a single cause of action, and the defendants' motion to strike was properly denied.

■ The defendants next assert that section 14A—3 of the School Code (Ill. Rev. Stat. 1985, ch. 122, par. 14A—3) provides them with authority to withhold gifted education funds from a local school district when they determine racial segregation exists in the district's gifted program. Section 14A—3 reads:

"Supervision of program. The administration of the [gifted] program herein enacted, including establishing standards for personnel, shall be supervised by the [ISBE] with the advice of an Advisory Council on Education of Gifted Children. The [ISBE] shall provide that, to the extent possible with the resources available, all gifted and talented children have an opportunity to receive services and participate in appropriate programs. The State Board shall also ensure that appropriations for programs for gifted children are spent in effective and effi-

cient ways." Ill. Rev. Stat. 1985, ch. 122, par. 14A—3.

We disagree that the general supervisory power established by section 14A—3 translates to provide authority for the actions taken by the defendants in the instant case. Here, without giving notice to the Peoria school district of its intention to withhold funds, and without providing any type of hearing on the alleged discrimination, the defendants unilaterally determined that the Peoria school district was engaging in intentional racial segregation, and withheld funds based on that unilateral determination. The defendants' authority is much more limited than they wish to admit, as was made clear by our supreme court in the analogous case of *Aurora East Public School District No. 131 v. Cronin* (1982), 92 Ill. 2d 313.

*Aurora East* concerned regulations promulgated by the ISBE in an attempt to enforce the Armstrong Act (Ill. Rev. Stat. 1985, ch. 122, par. 10—21.3), which provides in pertinent part:

"As soon as practicable, and from time to time thereafter, the [local] board shall change or revise existing [attendance centers] or create new [attendance centers] in a manner which will take into consideration the prevention of segregation and the elimination of separation of children in public schools because of color, race or nationality." Ill. Rev. Stat. 1985, ch. 122, par. 10—21.3.

If the ISBE determined that a local school district was not in compliance with the regulations, the Superintendent notified the district of that status. The district was then afforded 90 days in which to submit a plan in an effort to achieve conformance. If the school district failed to submit, amend or implement a plan, it was considered to be in noncompliance, and it was placed on probation. If a district remained on probation for one year without effecting compliance, the ISBE placed the district on nonrecognition status. When a school district lost recognition, the ISBE could withhold all Federal funding to which the district would otherwise be entitled.

The supreme court recited several reasons for determining that the ISBE did not have the extensive authority it was seeking. These included:

(1) When the legislature intended to delegate authority to the ISBE, it did so expressly and specifically, and it did not do so with regard to the Armstrong Act. *Aurora East Public School District No. 131 v. Cronin* (1982), 92 Ill. 2d 313, 326-27.

(2) There were no standards or guidelines governing the ISBE's discretion to enforce the Armstrong Act, thus indicating that no power was intended to be given to the ISBE. 92 Ill. 2d 313, 327.

(3) The legislature *did* establish a procedure by which the ISBE could combat segregation in section 22—19 of the School Code (Ill. Rev. Stat. 1985, ch. 122, par. 22—19), which provides in part:

"Upon the filing of a complaint with the State Board of Education *** alleging that any pupil has been excluded from or segregated in any school on account of his or her color, race, nationality, sex, religion or religious affiliation *** by or on behalf of the school board of such district, the State Board of Education shall promptly mail a copy of such complaint to the secretary or clerk of such school board.

The State Board of Education shall fix a date *** for a hearing upon the allegations therein. The State Board of Education may also fix a date for a hearing whenever it has reason to believe that such discrimination may exist in any school district. ***

The State Board of Education may designate an assistant to conduct such hearing and receive testimony concerning the situation complained of. *** The hearing officer shall report a summary of the testimony within 60 days after the hearing commences *** to the State Board of Education who shall determine whether the allegations of the complaint are substantially correct. *** The State Board of Education shall notify both parties of its decision within 30 days after it receives a summary of the testimony from the hearing officer. If the State Board of Education determines that a violation exists, *it shall request the Attorney General to apply to the appropriate circuit court for such injunctive or other relief as may be necessary to rectify the practice complained of.*" (Emphasis added.)

The reasons stated in *Aurora East* for determining that the ISBE did not have the extensive authority it sought to combat segregation under the Armstrong Act are equally applicable in rejecting the defendants' contention that section 14A—3 grants them the extensive authority they seek to combat alleged segregation within the gifted program. In section 14A—3, the legislature did not expressly and specifically delegate authority to the ISBE to withhold funds upon its determination that a particular district is engaging in intentional racial segregation. Therefore, the legislature did not intend that the ISBE have such authority. Secondly, there are no standards or guidelines within section 14A—3 governing the ISBE's discretion to determine whether a local district is engaging in discrimination. This again indicates that no such discretion was intended to be given to the ISBE. Finally, the comprehensive provision set forth in section 22—19 of the

School Code establishes a procedure by which the ISBE can combat what it deems to be intentional racial segregation in the plaintiff's gifted program. Section 22—19 clearly recites the powers which the legislature intended the ISBE to have. (*Aurora East Public School District No. 131 v. Cronin* (1982), 92 Ill. 2d 313, 328.) Nowhere does the section authorize the ISBE to promulgate its own sanctions, such as withholding funds, after unilaterally determining that a local school district is engaging in intentional racial segregation. As the supreme court stated in *Aurora East*, the proper course of action for the ISBE to take if it investigates and determines discrimination exists is to request the Attorney General to file suit for appropriate relief. "This procedure insures that the [ISBE] will not assume the role of prosecutor, judge, and enforcer of its own sanctions." 92 Ill. 2d 313, 332.

■ The defendants next assert that the Equal Educational Opportunities Act of 1974 (EEOA) (20 U.S.C. secs. 1701-1758 (1978)) imposes a duty on them, as an educational agency, to prevent and correct racial segregation in State-funded education programs. Therefore, the defendants argue, the EEOA provided them with authority to withhold funds from the plaintiff's gifted program when they determined that it was being operated in a discriminatory manner. Defendants rely on that part of the Act stating:

"No State shall deny equal educational opportunities to an individual on account of his or her race, color, sex, or national origin, by—

(a) the deliberate segregation by an educational agency of students on the basis of race, color, or national origin among or within schools;

(b) the failure of an educational agency which has formerly practiced such deliberate segregation to take affirmative steps, consistent with part 4 of this subchapter, to remove the vestiges of a dual school system." 20 U.S.C. 1703 (1978).

We do not agree that the defendants can look to Federal law to support their actions. Our supreme court stated in *Aurora East*:

" 'This court has consistently held that, inasmuch as an administrative agency is a creature of statute, any power or authority claimed by it must find its source within the provisions of the statute by which it is created.' " *Aurora East Public School District No. 131 v. Cronin* (1982), 92 Ill. 2d 313, 326.

Even assuming that the EEOA did impose a duty on the defendants, that duty could have easily been fulfilled by following the procedure outlined in section 22—19 of the School Code (Ill. Rev. Stat. 1985, ch. 122, par. 22—19), as outlined above. Instead, the defendants

completely ignored the express statutory provision found in section 22—19 and adopted their own arbitrary method for dealing with perceived segregation. This we cannot allow.

In a final attempt to circumvent the express statutory provision of section 22—19, the defendants argue that the fourteenth amendment and general Federal civil rights statutes provide them with authority to withhold funds from a program which they deem to be intentionally segregated by race. We reject this argument for the same reasons that we reject the argument that the EEOA provides authority for the action taken by the defendants in this matter.

It is for the reasons stated herein that we affirm the judgment of the circuit court of Peoria County.

Affirmed.

SCOTT, P.J., and STOUDER, J., concur.