## BOARD OF EDUCATION OF the CITY OF PEORIA, SCHOOL DISTRICT NO. 150, Plaintiff-Appellee,

v.

## ILLINOIS STATE BOARD OF EDUCATION, Defendant-Appellant.

No. 85–2692.

United States Court of Appeals, Seventh Circuit.

Argued April 2, 1986.

Decided Jan. 27, 1987.

Rehearing and Rehearing En Banc Denied March 18, 1987.

Cudahy, Circuit Judge, dissented and filed an opinion.

Julia Quinn Dempsey, Illinois State Board of Education, Chicago, Ill., for defendant-appellant.

David J. Dubicki, Kavanagh, Scully, Sudow, White, & Frederick, P.C., Peoria, Ill., for plaintiff-appellee.

Before CUDAHY and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

The Illinois State Board of Education (State Board) appeals the district court's dismissal of its counterclaim against the Board of Education of the City of Peoria, School District 150 (Peoria Board) for lack of standing. We affirm.

## I

### Statement of the Case

On March 26, 1984, the Peoria Board filed suit in district court against the United States Department of Education (USDE) and the State Board. The Peoria Board sought to enjoin the USDE from conducting an administrative hearing pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d *et seq.*, on charges that the Peoria Board was intentionally operating a segregated educational program. The Peoria Board named the State Board as an additional defendant because the State Board was a respondent in the administrative proceedings which the Peoria Board

sought to enjoin. The State Board filed a counterclaim.[1] It alleged that the Peoria Board was guilty of *de jure* segregation in the operation of its "Gifted Education Program." [2] It sought a declaratory judgment and requested temporary and permanent injunctive relief against the alleged discrimination.

Eventually, the Peoria Board reached a settlement with the USDE. Consequently, the USDE was dismissed as a party. The Peoria Board's complaint against the State Board was also dismissed. Finally, the Peoria Board moved to dismiss the State Board's counterclaim against it. It submitted that the State Board had no standing to assert the matters raised in the counterclaim. In the alternative, the Peoria Board requested that the district court abstain and postpone further proceedings on the counterclaim until state law issues could be resolved in a state court action between the two parties.

On August 30, 1985, the district court granted the Peoria Board's motion to dismiss. It held that the State Board lacked standing to challenge intentional racial segregation by the Peoria School District.

## II

### The Holding of the District Court

In its memorandum opinion, the district court characterized the "thrust" of Peoria's motion as a contention that the State Board "lacks standing to challenge intentional racial discrimination by a local public school district." R. 22 at 2. The court held that, under the law of Illinois, the State Board did not have authority to initiate litigation to eliminate racial segregation. Rather, held the court, the law of Illinois contemplates that, if the State Board determines that segregation exists, it may request that the Illinois Attorney General apply to the appropriate court for relief. In reaching this determination, the district court relied heavily upon *Aurora East Public School District No. 131 v. Cronin*, 92 Ill.2d 313, 66 Ill.Dec. 85, 442 N.E.2d 511 (1982).

The district court also held that no federal constitutional or statutory provision imposed an affirmative obligation on the State Board to bring such a suit. "It is neither the letter nor spirit of applicable federal law to create authority on the part of the [State Board] to take any particular type of action. Rather, it is left to the states to determine how to fulfill their responsibilities under the United States Constitution and applicable federal statutes." R. 22 at 4.

Finally, the district court held that the State Board did not have standing to assert the constitutional rights of the students.

## III

### Merits

#### A. The Issue

We believe that the district court correctly resolved the narrow question before it. While that court, responding to the submission of the parties, addressed the problem in terms of "standing," we believe that the situation is more precisely analyzed as one of capacity to sue.[3] "Capacity

1. The State Board invoked both pendent jurisdiction and federal question jurisdiction claiming that its action was authorized under 42 U.S.C. §§ 1981 & 1983. According to the State Board, it had received complaints from parents of black students in the School District 150 in Peoria that the "Gifted Education Program" was operated in a racially discriminatory manner.

2. According to the State Board's counterclaim, the "Gifted Education Program" is a special program for students attending grades four through eight. The program, available to some 300 students in those grades, is intended to "give special training and enhanced educational opportu-

nity to academically gifted children." R. 10 at 6, ¶ 4. The USDE inquiry did not raise the issue of segregation in the gifted program.

3. The concepts of standing and capacity to sue are certainly closely related. *See, e.g., Baxley v. Rutland*, 409 F.Supp. 1249, 1256–57 (M.D.Ala. 1976) (discussing the same issue both in terms of standing and capacity to sue). We can hardly fault the district court for choosing the approach it did. At least one other court appears to have followed the same course. *School Dist. of Kansas City, Missouri v. Missouri*, 460 F.Supp. 421, 437–41 (W.D.Mo.1978), *appeal dismissed*, 592 F.2d 493 (8th Cir.1979). One can certainly

has been defined as a party's personal right to come into court, and should not be confused with the question of whether a party has an enforceable right or interest or is the real party in interest." 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1559, at 727 (1971). It concerns "the personal qualifications of a party to litigate...." *Id.*[4] Fed.R.Civ.P. 17(b)[5] basically provides that the matter of capacity be determined under state law. It is well established that the "capacity of an officer of a state, or of a political subdivision of a state, will be determined by the law of the state in which the district court is held." 3A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 17.19, at 199 (2d ed. 1986); *see Baxley v. Rutland,* 409 F.Supp. 1249 (M.D.Ala.1976) (capacity of Alabama Attorney General to institute and prosecute action challenging the constitutionality of Alabama statute must be determined by the law of the State of Alabama); *see also National Ass'n of Theatre Owners of Wisconsin, Inc. v. Motion Picture Comm'n,* 328 F.Supp. 6 (E.D.Wis.1971) (Since commission had capacity to be sued as a matter of state law, it had the capacity to be sued

under federal law.). We therefore turn to an examination of Illinois law to determine whether the State Board is a proper party plaintiff.

**B.  The Role of the State Board**

■ Through its state constitution and various legislative enactments, Illinois has divided responsibility for its school system between state and local authorities. When viewed in its entirety, the constitutional and legislative scheme reflects deliberate— and careful—choices with respect to the distribution of authority. Under Illinois law, the respective roles of the State Board and the local school boards are clearly defined. The Illinois Constitution, art. X, § 2(a) provides that the State Board, "*except as limited by law,* may establish goals, determine policies, provide for planning and evaluating education programs and recommend financing. The Board shall have such other duties and powers as provided by law" (emphasis supplied). The Illinois School Code provides that the State Board "shall recommend the passage and the legislation necessary to determine the appropriate relationship between the Board

argue that, since the State Board had no statutory authority to bring suit, it has suffered no "injury in fact" since it has "no personal stake in the outcome of the controversy...." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Such an analytical approach to the problem at hand seems awkward, however, since, as we discuss later in the text, the State Board clearly has a role in the investigation—although not the prosecution—of complaints about the lack of racial equality in the schools. While the result would be the same under either approach, we believe that the issue can be approached more forthrightly in terms of capacity to sue.

4.  We are aware that Fed.R.Civ.P. 9(a) requires that the matter of capacity to sue be raised by "specific negative averment." In its memorandum in support of its motion to dismiss, the Peoria Board raised the issue of the State Board's authority to bring this action in terms of standing rather than as capacity to sue. *See* R. 14 at 1 (stating that "the [State Board's] only authority and duty with regard to discrimination in a local district was to hold an administrative hearing pursuant to Section 22–19 of the School Code"). Under the circumstances of this case, we believe that this statement constitutes

sufficient compliance with Rule 9(a). As we have already noted, *see supra* note 3, the questions of standing and capacity to sue are, in cases of this sort, interrelated. Moreover, it is clear that both parties and the district court were apprised fully of the Peoria Board's objection to the State Board's counterclaim.

5.  Rule 17(b) provides:
    The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of his domicile. The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized. In all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held, except (1) that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States, and (2) that the capacity of a receiver appointed by a court of the United States to sue or be sued in a court of the United States is governed by Title 28, U.S.C. §§ 754 and 959(a). Fed.R.Civ.P. 17(b).

and local boards of education and the various State agencies and shall recommend desirable modifications in the laws which affect schools." Ill.Ann.Stat. ch. 122, ¶ 1A–4(C). This same statutory scheme authorizes the State Board to "supervise all the public schools in the State." Ill.Ann. Stat. ch. 122, ¶ 2–3.3.

The Illinois legislature has vested the local school boards with general authority to ensure that individual school systems are operated in a nondiscriminatory manner. The legislature has charged the local school boards:

> To establish one or more attendance units within the district. As soon as practicable, and from time to time thereafter, the [local] board shall change or revise existing units or create new units in a manner which will take into consideration the prevention of segregation and the elimination of separation of children in public schools because of color, race or nationality.

Ill.Ann.Stat. ch. 122, ¶ 10–21.3. Still another provision of the School Code reinforces the view that the Illinois legislature intended desegregation to be the primary responsibility of the local boards:

> [Local School Boards have the duty] [t]o assign pupils to the several schools in the district; to admit non-resident pupils when it can be done without prejudice to the rights of resident pupils and provide them with any services of the school including transportation; ... but no pupil shall be excluded from or segregated in any such school on account of his color, race, sex, or nationality. *Nothing herein shall be construed to permit or empower the State Board of Education to order, mandate or require busing or other transportation of pupils for the purpose of achieving racial balance in any school.*

Ill.Ann.Stat. ch. 122, ¶ 10–22.5 (emphasis supplied).

The foregoing constitutional and legislative scheme represents Illinois' decision as to how best to distribute responsibility within state government with respect to the important task of achieving and maintaining racial equality in education. While local boards have the primary duty to take appropriate action, they are subject to the supervision and oversight of the State Board. More precisely, the State Board investigates charges of segregation according to a well-defined statutory procedure. Ill.Ann.Stat. ch. 122, ¶ 22–19 provides that, upon receipt of a complaint endorsed by the lesser of fifty residents or ten percent of the district's residents that a pupil has been impermissibly segregated from any school, the State Board may conduct a hearing to determine the merits of the complaint. If, after a full hearing, the State Board determines that a violation exists, "it shall request the Attorney General to apply to the appropriate circuit court for such injunctive or other relief as may be necessary to rectify the practice complained of." *Id.*

■ Our interpretation of the division of responsibility contemplated by the Illinois constitutional and statutory scheme is confirmed by the decision of the Illinois Supreme Court in *Aurora East Public School Dist. No. 131 v. Cronin,* 92 Ill.2d 313, 66 Ill.Dec. 85, 442 N.E.2d 511 (1982). In *Aurora East,* two school districts challenged the validity of desegregation rules adopted by the State Board. The circuit court and the intermediate appellate court found the rules to be invalid and enjoined their enforcement. 66 Ill.Dec. at 85–6, 442 N.E.2d at 512–13. In affirming the judgment of the Illinois Appellate Court, the Supreme Court emphasized that the State Board's authority to act has been "detailed by the legislature." [6] *Id.* 66 Ill.Dec. at 91, 442 N.E.2d at 517. Such a limitation was found in paragraph 22–19 of the School Code, which:

6. The limited role of the State Board in Illinois' overall fulfillment of its responsibilities with respect to racial equality in education also precludes any possibility of the Board's maintaining a *parens patriae* action. *See United States v.* *City of Pittsburg, California,* 661 F.2d 783, 787 (9th Cir.1981); *In re Multi-District Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122, 131 (9th Cir.), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973).

establishes the procedure by which defendants may combat segregation. In particular, if defendants investigate and determine that discrimination exists, they may request the Attorney General to file suit for appropriate relief.... Consequently, the proper course is for defendants to conduct a hearing and refer to the Attorney General any findings of discrimination. This is the extent of the [State] Board's obligation. It is for the Attorney General, as representative of the People, to file suit when a district engages in discriminatory practices.

*Id.* 66 Ill.Dec. at 94, 442 N.E.2d at 520. More recently, the Appellate Court of Illinois held that the State Board did not have the authority to withhold funds from the Peoria Board's gifted program which was allegedly operated in a discriminatory manner. The Appellate Court reasoned that "the proper course of action for the [State Board] to take if it investigates and determines discrimination exists, is to request the Attorney General to file suit for appropriate relief." *Board of Educ. of the City of Peoria, School Dist. No. 150 v. Sanders,* 150 Ill.App.3d 755, 104 Ill.Dec. 233, 239, 502 N.E.2d 730, 736 (1986).

▮ It is clear that the Attorney General may act to remedy discrimination in Illinois schools.[7] In such cases, the Attorney General acts on behalf of the people of the state, who are the real parties in interest. It is well-settled, under Illinois law, "that the Attorney General is the sole officer authorized to represent the People of [Illinois] in any litigation in which the People of the State are the real party in interest, absent a contrary constitutional directive."

*People ex rel. Scott v. Briceland,* 65 Ill.2d 485, 500, 3 Ill.Dec. 739, 746, 359 N.E.2d 149, 156 (1976).

C. The Federal Dimension

▮ The State Board also argues that, since its counterclaim arises under federal as well as state law, it may maintain this counterclaim. More specifically, the State Board submits that its action was required by the Equal Educational Opportunities Act of 1974 (EEOA), 20 U.S.C. §§ 1701–1758. The EEOA provides that:

No *State* shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by—

(a) the deliberate segregation by an educational agency of students on the basis of race, color, or national origin among or within schools;

(b) the failure of an educational agency which has formerly practiced such deliberate segregation to take affirmative steps ... to remove the vestiges of a dual school system....

20 U.S.C. § 1703 (emphasis supplied). The statute does not require that the power to enforce its mandate be vested in any particular state agency; it simply requires that the *state* ensure compliance. Illinois has chosen to vest primary responsibility in its local school boards, supervisory and investigatory responsibility in its State Board and enforcement responsibility in its Attorney General. If the State Board desires a redistribution of those responsibilities, it must address the state legislature, not the federal court.[8]

---

**7.** The Board argues that it has third party standing to vindicate the rights of the children. Because those rights can be vindicated by the children's parents and by the Attorney General, there is no reason to permit the use of this device. *See Singleton v. Wulff,* 428 U.S. 106, 113–15, 96 S.Ct. 2868, 2873–75, 49 L.Ed.2d 826 (1976) (opinion of Blackmun, J.). *See generally Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).

**8.** The State Board seems to argue that, in *McNeese v. Board of Educ.,* 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), the Supreme Court

held that the procedures set forth in paragraph 22–19 of the School Code provide an unsatisfactory means for it to satisfy its duties under the EEOA. However, in *McNeese,* the Supreme Court merely held that private litigants need not avail themselves of the state's administrative procedures before bringing suit under 42 U.S.C. § 1983 to protest racial segregation in the Illinois public school system. The Court held that "relief under the Civil Rights Act may not be defeated because relief was not first sought under state law which provided a remedy." *Id.* at 671, 83 S.Ct. at 1435.

Finally, the State Board relies upon *Los Angeles Branch NAACP v. Los Angeles Unified School Dist.*, 714 F.2d 946 (9th Cir.1983), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2398, 81 L.Ed.2d 354 (1984); *Idaho Migrant Council v. Board of Educ.,* 647 F.2d 69 (9th Cir.1981); and *United States v. School Dist. of Ferndale,* 577 F.2d 1339 (6th Cir.1978) as authority for its right to maintain this action. However, none of these cases is helpful to the Board. They merely stand for the proposition that a state board of education is a proper party *defendant* when the plaintiff alleges that its failure to fulfill its responsibilities under state law has produced state non-compliance with the EEOA.

Indeed, these cases help to underline the narrowness of today's holding. We hold only that the State Board does not have the competence to maintain an action to ensure equality in education because the Illinois legislature has chosen to give the Board a more limited role in fulfilling the State's overall responsibility and has vested the authority to bring such actions in its Attorney General. We do *not* hold that the State Board or any other governmental entity is unaccountable when it contributes to a violation of the constitution or laws of the United States simply because its role in the overall state activity is a limited one.

Accordingly, the judgment of the district court is affirmed.

AFFIRMED.

CUDAHY, Circuit Judge, dissenting:

The implications of the majority's result are not nearly as "narrow" as the majority suggests. The case before us significantly implicates the Supremacy Clause and furnishes a dangerous precedent for frustrating federal anti-discrimination statutes and the fourteenth amendment through allocations of responsibility for civil rights enforcement among state agencies and local governmental bodies under state law.

The majority opinion essentially makes two points: (1) under Illinois law, the local boards have primary responsibility to see that schools are operated in a nondiscrimi-natory manner; and (2) insofar as the Equal Educational Opportunities Act of 1974, 20 U.S.C. §§ 1701–1758 (1982) (the "EEOA"), requires that the *state* ensure compliance with the terms of this act, Illinois has fulfilled its duty by vesting supervisory and investigatory responsibility in the State Board and enforcement responsibility in the State Attorney General. I take issue with both these points.

In concluding that the Illinois legislature intended that local boards have primary responsibility for desegregation, the majority relies heavily on *Aurora East Public School District No. 131 v. Cronin,* 92 Ill.2d 313, 66 Ill.Dec. 85, 442 N.E.2d 511 (1982). *Aurora East,* however, does not bear the weight placed on it by the majority. That case merely held that under Illinois law, the State Board was not authorized to promulgate regulations under the Armstrong Act. Ill.Rev.Stat. ch. 122, para. 10–21.3 (1985). The Armstrong Act was a measure intended to deal only with *de facto* segregation. Neither that act nor *Aurora East* bears on the specific duty of the State Board under the EEOA to combat *intentional* racial segregation, which is the allegation here.

More important, the State of Illinois has a duty under the Constitution and the general federal civil rights statutes to combat intentional racial segregation. State educational officials, who are the members of the state's executive branch charged with the oversight of education in the state, have a duty under federal law to enforce the Constitution and the federal statutes which implement it. The State Board, as the only state-level watchdog for civil rights in education, has an obligation to enforce the Constitution and the general civil rights statutes. *See Bradley v. Milliken,* 484 F.2d 215, 238–44 (6th Cir.1973) (en banc), *rev'd on other grounds,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974).

The EEOA imposes specific responsibilities on the State Board:

No *State* shall deny equal educational opportunity to an individual on account

of his or her race, color, sex, or national origin, by—

(a) the deliberate segregation by an *educational agency* of students on the basis of race, color, or national origin among or within schools;

(b) the failure of an *educational agency* which has formerly practiced such deliberate segregation to take affirmative steps ... to remove the vestiges of a dual school system;

.    .    .    .    .

(d) discrimination by an *educational agency* on the basis of race, color, or national origin in the employment, employment conditions, or assignment to schools of its faculty or staff....

20 U.S.C. § 1703 (1982) (emphasis added). The term "educational agency" is defined in the EEOA to mean a local educational agency or a state educational agency as defined by section 3381(k) of 20 U.S.C. (1982). 20 U.S.C. § 1720(a) (1982). This definition clearly encompasses the State Board. In addition, the State Board is without question a part of the government of the State of Illinois. Ill. Const. art. X, § 2. Hence, the State Board is subject to the duties imposed by the EEOA. *See United States v. School District of Ferndale*, 577 F.2d 1339, 1346–48 (6th Cir.1978); *Idaho Migrant Council v. Board of Education*, 647 F.2d 69, 71 (9th Cir.1981).

It is surely not an adequate answer to say that the state has delegated these duties to its local school districts and therefore that the state as such, through educational officials at the state level, has no further responsibility. To accept this proposition is to suggest that federal civil rights enforcement may be effectively nullified by entrusting it under state law to the very entities against which enforcement might be required.

Nor is reliance on the procedure provided in Ill.Rev.Stat. ch. 122, para. 22–19 any sort of an answer. The gist of that position is that *intentional* (*de jure*) segregation in Peoria may be combatted only if a complaint, joined by the lesser of 50 residents of a school district or 10 percent of the residents, prompts the State Board to initiate hearings on allegations of discrimination. And the holding of such a hearing would in itself provide no remedy. While the State Attorney General may have the power to seek enforcement after the State Board holds a hearing, his office is not the agency to which state resources to underwrite substantive responsibility for education are committed.[1] This mechanism is also too cumbersome to provide effective oversight of local boards. The United States Supreme Court in *McNeese v. Board of Education*, 373 U.S. 668, 674–75, 83 S.Ct. 1433, 1437–38, 10 L.Ed.2d 622 (1963), pointed out emphatically the manifest inadequacies of this statutory approach. As the majority points out, *McNeese* did not arise in the precise context of the present case, but that hardly makes its critique of the procedure in question any less telling.

The majority believes "that the Illinois legislature intended desegregation [including presumably the barring of *de jure* segregation] to be the primary responsibility of the local boards." Op. at 711. I doubt that the Illinois legislature had any intent going beyond implementation of the Armstrong Act to confront *de facto* segregation. But, even if Illinois wanted to leave all civil rights enforcement to its local school districts, it had no power under federal law to do this when the school districts themselves were the likely civil rights violators. In general, a state may "distribute responsibility" within state government. But it may not do so when, as here, a federal duty has been placed on the state and the result of the state legislature's

---

**1.** It is also no answer to say that while the State Board cannot sue local boards to enforce the EEOA, the State Board can be sued if "it contributes to a violation of the constitution or laws of the United States...." Op. at 713. While the State Board's amenability to suit ensures

that the *State* Board can be held accountable if it violates the EEOA, the problem addressed by this dissent is the lack of an effective mechanism to enforce the EEOA as against the *local* boards.

distribution of responsibility in fulfilling this duty is to leave only foxes at the chicken coop door. The capacity-to-sue doctrine serves a number of useful purposes. But one of these is not to nullify federal law as it imposes duties on state officials. I would therefore reverse the judgment and put the Board to its proof on its counterclaim.

I therefore respectfully dissent.